# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| AUTOMOBILE MECHANICS' LOCAL NO. 701 UNION AND INDUSTRY PENSION FUND; and AUTOMOBILE MECHANICS' LOCAL NO. 701 UNION AND INDUSTRY WELFARE FUND, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 16-cv-08967 |
| v. | ) ) | Judge Edmond E. Chang |
| DYNAMIC GARAGE, INC., an Illinois Corporation; and FAB EXPRESS, INC. an Illinois Corporation, | ) ) ) ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiffs Automobile Mechanics' Local No. 701 Union and Industry Pension Fund and Automobile Mechanics' Local No. 701 Union and Industry Welfare Fund (the Funds) are multi-employer pension and benefit plans governed by federal law. 29 U.S.C. §§ 1002(37) and 1302(a)(3).[1] They receive contributions from certain employers pursuant to various collective bargaining agreements made between the employers and the Automobile Mechanics' Local 701, International Association of Machinists and Space Workers, and AFL-CIO, of Chicago and vicinity (the Union). The Funds assert that Dynamic Garage, Inc. (Dynamic) and a related corporation, FAB Express, Inc. (FAB), owe unpaid contributions, and the Funds now move for

---

[1]This Court has subject matter jurisdiction over the case under 28 U.S.C. § 1331 and 29 U.S.C § 1132.

summary judgment on all their claims. Dynamic and FAB (the Defendants) have cross-moved for summary judgment, requesting that the Court dismiss all the Funds' claims. For the reasons stated below, both motions are granted in part and denied in part.

## I. Background

A trip back in time is needed to understand this case. In 1985, Fred Bartuch, Jr. (Bartuch) opened FAB, a trucking company that operates in the Midwest. R. 58.9, Bartuch Dep. at 10:20-21; R. 61.1, Bartuch Aff. ¶ 5. It currently has five customers in Chicago. Bartuch Aff. ¶ 5. At the time, Bartuch's father owned his own trucking company, Jay-Bee Cartage Co. (Jay-Bee). R. 58.4, Kofkin Dep. at 15:21-16:23. Both companies had mechanics on staff to provide some service to the trucks and to complete repairs, but FAB also relied on outside vendors to do much of its mechanical work. Kofkin Dep. at 15:21-24; Bartuch Aff. ¶¶ 7-8. Jay-Bee's two staff mechanics were represented by Local 701, but FAB did not employee any union members. Kofkin Dep. at 15:21-24, 18:10-19:3.

In 1994, Jay-Bee went out of business. Kofkin Dep. at 16:24-17:4. In order to help Jay-Bee's two union mechanics maintain their employment benefits, Bartuch's father opened Dynamic. Kofkin Dep. at 24:12-24. Dynamic hired the two mechanics, who serviced FAB's trucks exclusively. *Id.* at 48:16-51:7; Bartuch Dep. at 51:12-52:7. Dynamic entered into a collective bargaining agreement (CBA) with the Union. R. 61.5, 1994-2003 CBAs at 1.

At the same time as entering the CBA, Dynamic entered into a benefits-participation agreement with the Funds, obligating it to contribute on behalf of all employees covered under the CBA. R. 58.5, Participation Agreements. The agreement remained in "full force and effect for the term of the current Collective Bargaining Agreement between the Employer or area wide Employers and the Union shall be automatically renewed from time to time for terms coterminous" with the CBA. *Id.* at 1, ¶ 3. There was a way out of the Participation Agreement: the employer could terminate the agreement, but the employer had to notify the Funds of its intention to terminate sixty days before the termination of the existing CBA. *Id.* at 1, ¶ 6. If an employer failed to do this, then it was bound to the provisions of the Participation Agreement "for the period of the next Collective Bargaining Agreement and thereafter until proper notice is given but in no event less than three years unless terminated by the Trustees." *Id.* Dynamic entered into virtually identical Participation Agreements with the Funds in 1998, 2003, 2008, and 2011. *Id.* at 1-10; R. 58.6, Bukovac Certification, ¶ 10.

The initial CBA included a Recognition Clause, which stated that the Union was "the sole and exclusive bargaining representative of the employees" covered by the agreement. R. 61.5, 1994-2003 CBAs at Art. 2. The CBA went on to define "mechanic" as "any person who dismantles or repairs or assembles any part of the car, truck, tractor, trailer, automobile body or internal combustion engine." *Id.* at 4, § 7. In 2003, the parties amended the CBA, replacing the word "employees" with "Tractor mechanics" in the Recognition Clause and removing the classification of

"Trailer mechanic" altogether. Kofkin Dep. at 53:9-57:2; R. 61.8, Kofkin Proposals to the Union; R. 58.3, 2003-2017 CBAs, Art. 2, § 2. But the parties did not explicitly define "Tractor mechanic" anywhere in the agreement. *See* 2003-2017 CBAs.

In 2008, the parties amended the CBA again. Kofkin Dep. at 60:3-14, 63:14-64:3. This time, they expanded the "Letting Out of Work" clause to address the possibility that Dynamic might need to use additional mechanics to address FAB's growing work load. Kofkin Dep. at 60:15-61:13, 63:14-64:23; 2003-2017 CBAs, Art. 10. The parties agreed that Dynamic could subcontract mechanical work if the two tractor mechanics on payroll met their minimum hourly guarantee. Kofkin Dep. at 60:15-61:13; 2003-2017 CBAs, Art. 10.

The 2003 and 2008 changes were carried forward into subsequent CBAs. *See* 2003-2017 CBAs. Indeed, through its lawyer, Leonard Kofkin, Dynamic entered into seven different collective bargaining agreements with the Union over the course of 22 years. *See* 1994-2003 CBAs; 2003-2017 CBAs. During this period, the Union audited Dynamic in 2009, 2012, and 2014. R. 61.9, 2009 Audit Report; R. 61.10 2012 Audit Report; R. 61.11, 2014 Audit Report. None of these turned up any unpaid contributions or outstanding obligations. 2009 Audit Report; 2012 Audit Report; 2014 Audit Report.

In 2016, Bartuch became the sole owner of Dynamic. R. 58.12, Dynamic Corporate Resolutions at 20. Bartuch was the President of both Dynamic and FAB, while his brother was the Vice President of both entities. Bartuch Dep. at 22:12-14; R. 58.11, FAB Corporate Resolutions. Dynamic and FAB operated out of the same

facility, for which only FAB paid rent. Bartuch Dep. at 41:16-43:17; R. 58.10, Adamitus Dep. at 87:4-21. Dynamic also used FAB's administrative personnel, supervisors, human resources personnel, and accounting staff. Bartuch Dep. at 74:10-75:5; Adamitus Dep. at 26:11-19, 30:24-33:12. Since 2008, Natividad Salazar and David Bednarowicz were Dynamic's only two employees, both of whom are Union mechanics. R. 58.19, Bednarowicz Dep. at 14:13-16; R. 58.23, Salazar Dep. at 24:4-8; Bartuch Dep. at 24:5-12, 51:17-21. Salazar and Bednarowicz had their own bays in the shared facility, but they worked in very close proximity to the FAB mechanics. Bartuch Dep. at 45:19-46:23; R. 58.15, Haberkorn Dep. at 19:4-19; R. 58.16, Almonaci Dep. at 22:3-5. All the mechanics were supervised by Krzysztof Siwicki, FAB's Maintenance Coordinator. Bartuch Dep. at 64:16-66:4; R. 58.17, Siwicki Dep. at 51:1-19, 103:15-104:2; Bednarowicz Dep. at 65:6-66:7; Salazar Dep. at 100:10-14, 107:19-108:5.

FAB has several mechanics on its payroll; they are categorized as trailer mechanics, field mechanics, drivers, or helpers. R. 61.1, Bartuch Aff. ¶ 12; R. 58.37 Rodriguez Dep. at 12:14-13:5, 24:21-25:6; Bednarowicz Dep. at 56:17-63:9. FAB also uses a subcontractor to perform both tractor and trailer mechanic work—a two-man operation called JJH Trucking, LLC (JJH). R. 58.36, Hukalowicz Dep. at 15:16-16:4, 56:13-57:19, 58:8-23; Adamitus Dep. at 87:23-88:3. FAB employs a foreman named Kevin Genebacher (the parties dispute whether he is a "supervisor"), who also performs work on tractors. Siwicki Dep. at 30:21-31:15, 38:22-39:3, 66:18-67:4; R.

58.22, Genebacher Dep. at 68:3-70:6. And finally, FAB relies on additional outside vendors for a portion of its repair work. Bartuch Aff. ¶ 18.

In June 2016, two Union representatives visited Dynamic and discovered that FAB trailer mechanics were performing—in the Union's view—bargaining-unit work on tractors. R. 61.12, Kimmel Dep. at 20:14-19; R. 61.7, Bukovac Dep. at 32:23-33:8. These representatives were visiting Dynamic for the first time and had little knowledge of its prior negotiations with the Union. Kimmel Dep. at 15:18-21; Albrego Dep. at 22:23-23:15, 25:6-23. The Union representatives reported what they witnessed to Steve Bukovac, the Funds' administrator, who initiated a special audit of both Dynamic and FAB. Bukovac Dep. at 44:20-45:7. FAB refused to cooperate with the audit, so the auditor suggested to Bukovac that he refer the matter to outside legal counsel. *Id.* at 50:18-51:5.

On May 1, 2017, Dynamic and FAB merged into one entity. R. 61.21, Articles of Merger. Dynamic sent notice of the merger to the Union on May 3, 2017 and stopped making contributions to the Funds immediately after that. R. 61.22, Notice of Merger; Bartuch Aff. ¶ 22. In July 2017, the Funds sent a notice of delinquency to Dynamic, asserting that Dynamic had failed to submit a remittance report or make monthly contributions for the month of May 2017. R. 61.23, Notice of Delinquency and Response. Meanwhile, back in September 2016, the Funds filed this action to recoup unpaid contributions for *all* of FAB's and Dynamic's mechanics. R. 1, Complaint. The Funds allege that Dynamic and FAB were in effect a single entity under either the alter-ego theory or the single-employer theory. *Id.* ¶¶ 22-65. The

Funds also assert that both Dynamic and FAB are under a continuing obligation to contribute on behalf of their covered employees because they failed to provide the Funds with timely notice of their intent to terminate the Participation Agreement. R. 57, Pls. Br. at 23.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## II. Analysis

### A. Alter Ego

First up is the Funds' claim that FAB is the alter ego of Dynamic and thus is bound by the CBA. The Funds argue that the record shows that "there was no respect given to the separate corporate identities between Dynamic and FAB," and "that the intent driving the operations of Dynamic and FAB was to avoid the responsibilities of the CBAs." Pls. Br. at 15. The Defendants counter that there is insufficient evidence in the record to infer unlawful motive or intent because "Dynamic was created with the very intent to create a benefit fund obligation for Dynamic's two employees." R. 60, Defs. Br. at 14. The defense argument is right.

In *Trustees of Pension Funds of Local 701 v. Favia*, 995 F.2d 785 (7th Cir. 1993), the Seventh Circuit explained the alter-ego doctrine in the context of nonpayment of pension contributions. *Id.* at 788-89. Generally, one corporation is considered the alter ego of another "where the factors necessary to support a 'single employer' finding are met and, in addition, the Board finds that the second corporation is a 'disguised continuance' of the employing enterprise, resulting in evasion of the employer's obligations under the labor laws." *Id.* at 788. Applying that analysis here, FAB should be treated as the alter ego of Dynamic only if it is demonstrated that the Defendants attempted to use FAB to divert work from Dynamic in order to avoid Dynamic's obligations under the CBA. The Funds have failed to show this.

It is uncontested that FAB was created by Fred Bartuch Jr. in February 1985, almost a decade *before* Dynamic was formed by Bartuch's father. Bartuch Dep. at

11:6-24; Kofkin Dep. at 48:16-49:5. *See also* R. 68, Pls.' Resp. DSOF ¶¶ 4, 12, 15. FAB has never employed union mechanics. Kofkin Dep. at 18:10-19:3. The Funds also concede that Bartuch's father formed Dynamic with the express purpose of employing two union mechanics who were soon to be out of work after Jay-Bee closed. Kofkin Dep. at 15:18-24, 48:16-51:7. *See also* Pls.' Resp. DSOF ¶¶ 12, 13, 15. Any presumption that Dynamic was created with an unlawful motive to avoid a contribution obligation is fatally undermined by what was actually a union-favorable genesis of Dynamic.

As the Defendants correctly point out, the facts of this case closely resemble those in *Architectural Iron Workers Local No. 63 Welfare Fund v. United Contractors, Inc.* 46 F.Supp.2d 769 (N.D. Ill. 1999). There, the non-signatory entity—Skys—was formed before the signatory entity—United Contractors. *Id.* at 788. Although the sequence of corporate formation is not always dispositive, *United Contractors* makes a persuasive general point: "[i]t seems somewhat illogical, if Skys merely sought to avoid union contribution requirements altogether, for it to create an entity … and then allow it to become a signatory to the very collective bargaining agreement it was trying to avoid." *Id.* Rather, by creating a separate, union entity, Skys actually increased contributions to the Funds. The same is true here.

It is true, as the Funds argue, that an alter-ego relationship sometimes can exist even where a non-union entity exists "side by side" with the union entity. R. 67, Pls. Reply at 7. And as noted earlier, the sequence of corporate formation is not always dispositive. But FAB's and Dynamic's situation is easily distinguishable from

those in the case cited by the Funds, *Chicago Dist. Council of Carpenters v. CGI Contracting, Inc.*, 1996 WL 66008 (N.D. Ill. Feb. 8, 1996). There, the court denied the employers' summary judgment motion, relying on two points that would permit a factfinder to conclude that the signatory company used the non-signatory company to evade a CBA. *Id.* at *4-5. First, the Funds presented evidence that the principal owner misled an auditor about the relationship between the signatory company and the non-signatory company by asserting that the non-signatory entity was a marketing company, rather than a general contractor. *Id.* at *5. No evidence like that is at play in this case: there is no evidence that the Defendants misled anyone—let alone the Funds' auditor—about the business purpose of either Dynamic or FAB.

Second, in *CGI Contracting*, there was undisputed evidence that the non-signatory company paid an ex-CGI union employee to perform covered carpentry work but did not report those hours to the trust funds or make any contributions on the employee's behalf. 1996 WL 66008, at *5. So there was evidence that covered work was performed but not reported. Here, in that vein, there is only a smattering of evidence of something similar. First, the Funds argue that, in March 2002, Natividad Salazar (one of Dynamic's two employees) received a single check directly from FAB for $300.00. R. 58.27, Checks to Salazar at 2; R. 62, Defs' Resp. PSOF ¶ 40. But the Funds present no more evidence about that the payment, and apparently engaged in no discovery to do so. The check represents a one-time payment in the midst of the almost 20 years that Salazar worked for Dynamic (he started there in 1999, and still works for the merged entity, Salazar Dep. at 17). So a reasonable trier of fact would

be guessing that the check had anything to do with Salazar performing covered work for FAB. It is also true that two of Salazar's employment form documents—his Form I-9 and direct deposit form—list FAB as his place of employment, rather than Dynamic. R. 58.24, Salazar Employment Documents; Defs' Resp. PSOF ¶ 32. But Salazar wrote that information on the forms back in 1999 and could not remember why he did that. Salazar Dep. at 15-17. All in all, the one check in 2002 and the two unexplained forms in 1999 are not enough to prompt a reasonable inference that FAB was trying to mislead the Funds about Salazar's "true" employer.

Finally, the Funds argue that evasive intent can be inferred from an employer's "disregard for distinct formalities between the two companies." Pls. Br. at 15. In support of this proposition, the Funds cite *Chicago Dist. Council of Carpenters Pension Fund v. P.M.Q.T., Inc.,* but that case is not analogous. Pls. Br. at 15 (citing 169 F.R.D. 336 (N.D. Ill. 1996)). There, the manager of both the signatory and non-signatory companies admitted that he would use the union employee for union work until he had "work[ed] enough hours to get his benefits," and then switch him over to the non-union company for the rest of the month. *Id.* at 344. The court held that capping the covered hours was enough to show that the defendants' "intent was to avoid contributing any more than the required minimum hours." *Id.* There is no similar evidence here; even if FAB and Dynamic did not completely keep all of the distinct corporate formalities in place, nothing about that suggests (as it would if there were a covered-work maximum policy) that Defendants *intended* to skirt their

contribution obligations. Summary judgment is granted to the Defendants against the alter-ego claim (and of course the Funds' cross-motion is denied).

## B. Single Employer

Next, the Funds argue that, even if the Defendants did not intend to evade contribution obligations, they still should be held liable because FAB and Dynamic "were a single enterprise under the single employer doctrine." Pls. Br. at 8. To determine whether two employers should be deemed a single employer for purposes of contributions, the Court must examine four factors: "(1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership." *Chicago Reg'l Council of Carpenters Pension Fund v. Schal Bovis, Inc.*, 826 F.3d 397, 404 (7th Cir. 2016). No single factor controls; rather, the Court must consider the "totality of the circumstances." *Id.*

To begin, there is overwhelming evidence in the record that Dynamic and FAB had a high degree of interrelation between their operations. In *Lippert Tile Co. v. Int'l Union of Bricklayers & Allied Craftsmen, Dist. Council of Wisconsin & Its Local 5*, the Seventh Circuit concluded that the operations of three entities were interrelated because they shared work space and one of the entities maintained the business records, processed the payroll, handled billing, and managed the bank accounts for the other two. 724 F.3d 939, 947 (7th Cir. 2013). Likewise here, it is undisputed that (1) FAB and Dynamic have operated out of the same work space since the late 1990s; (2) Dynamic has never paid rent for the shared space; (3) Dynamic uses FAB's clerical staff, accounting staff, operations managers, billing department, garage/shop office staff, and supervisory staff; and (4) Adamitus and Karrels, both of whom are FAB

employees, performed administrative-payroll work for Dynamic. *See* Bartuch Dep. at 36:1-10, 41:16-43:17, 74:10-75:5; Adamitus Dep. at 26:11-19, 32:18-33:12, 48:10-22, 87:4-21. This is more than enough to show that the operations of Dynamic and FAB were interrelated.

The next two factors—common management and centralized control over labor relations—are closely related to each other. In determining whether two ostensibly separate entities share common management, the Seventh Circuit has emphasized common control over hiring and firing of employees, as well as other daily management decisions. *See N.L.R.B. v. Emsing's Supermarket, Inc.*, 872 F.2d 1279, 1288-89 (7th Cir. 1989). Similarly, when assessing control over labor relations, courts consider, among other things, the person or entity who was responsible for the day-to-day labor decisions like setting wages, hiring, and firing. *Lippert Tile Co.*, 724 F.3d at 947.

Here, the Defendants dispute that FAB had control over Dynamic's labor relations or that the entities shared management. According to the Defendants, FAB's maintenance coordinator, Chris Siwicki, did "nothing more with respect to Dynamic mechanics than simply provide them with a work order when they asked what work needed to be done." Defs. Br. at 15. But the evidence does not support this assertion. It is undisputed that Siwicki sets the work-shift schedule for both FAB and Dynamic employees, Siwicki Dep. at 43:7-11, and that Siwicki and supervisor Kevin Genebacher were responsible for providing Dynamic mechanics with daily tasks and

instructions, *id.* at 40:10-41:14; Bartuch Dep. at 64:19-65:9; Bednarowicz Dep. at 65:24-66:14; Salazar Dep. at 108:3-21. *See also* Defs.' Resp. PSOF ¶ 72, 74.

Siwicki was also the manager who approved vacation days and time off for Dynamic employees. Bednarowicz Dep. at 69:23-71:22; Genebacher Dep. at 39:1-40:5; Salazar Dep. at 114:13-116:18. Both Bednarowicz and Salazar testified that they sought Siwicki's permission before taking time off. Bednarowicz Dep. at 70:10-15 ("A. [W]e get it authorized and we will mark it down so then he knows. Q. So you talked to him first, get permission and then put it on there? A. Right."); Salazar Dep. at 115:18-23 ("A. [W]hen I got a day off, got appointment, Doctor, something, I call day before, but no. Q. You tell Chris though the day before? A. Yeah."). The Defendants contest this fact, but the record evidence does not create a genuine dispute over it. Siwicki testified that Dynamic employees write down their vacation days on the calendar in his office. Siwicki Dep. at 60:15-61:17. But the Defendants did not elicit from him, one way or the other, whether he gives *permission* first. So, in the face of the employees' testimony, FAB had approval authority over Dynamic employees' schedules.

On discipline and hiring of mechanics, again the evidence establishes that Siwicki held primary responsibility for those aspects of labor relations. Siwicki Dep. at 45:6-24; Genebacher Dep. at 37:15-18:19, 40:13-16, 41:8-11. Indeed, Defendants do not meaningfully deny that Siwicki was responsible for "interviewing" and "assisting Bartuch with hiring." Defs.' Resp. PSOF ¶ 75. Rather, they simply allege that there "was no testimony about discipline to the Dynamic Mechanics." *Id.* Although it is true

that Siwicki did not provide specific examples of disciplining either Salazar or Bednarowicz (maybe those employees have never deserved discipline), he testified that he was the employee that was "going to discipline the mechanics," and that Genebacher was not to discipline anyone without speaking to him first. Siwicki Dep. at 45:6-24.

Finally, the last factor is easy. The parties do not dispute that there was common ownership of Dynamic and FAB. *See* Bartuch Dep. at 15:16-19, 20:21-24; Adamitus Dep. at 16:19-23; R. 58.11, FAB Corporate Resolutions; R 58.12 Dynamic Corporate Resolutions.

Taking all of this into account, a reasonable factfinder must conclude that Dynamic and FAB did not have an arm's-length relationship, and thus they comprise a single employer. *See Lippert Tile*, 724 F.3d at 947. Their operations are clearly interrelated and they share the same owners. Siwicki manages Salazar and Bednarowicz: he sets their work schedules, provides instructions on daily tasks, and approves their time off. If either employee ever needed to be disciplined, then he would have been the one to do it. Even when the evidence is viewed in the Defendants' favor, the records establishes that the two companies were a single employer. *See Lippert Tile,* 724 F.3d at 947-48 (affirming single-employer finding even though centralized control over labor relations remained disputed).[2] This might seem like a

---

[2]The Defendants argue that a single-employer analysis requires a determination that a single bargaining unit is proper. R. 69, Defs. Reply at 7. But the defense conflates two separate analyses. The Seventh Circuit has explained that, in some other circuits, once it is determined that two entities are a single employer, other courts require a showing that "workers were in the same bargaining unit" before applying a CBA to a non-contractual party. *See Lippert Tile*, 724 F.3d at 944 (citing Ninth Circuit, Third Circuit, and Second

bitter finding for FAB, because Dynamic was originally created to save two Union jobs, but federal employment law still required that FAB and Dynamic hew to a true separation of the employers.

### III. Application of the Collective Bargaining Agreement to FAB and JJH employees

Just because Dynamic and FAB have been deemed a single employer does not automatically mean FAB is on the hook for unpaid contributions. The next question is whether the CBA actually applies to any of FAB's employees. *See Moriarty*, 164 F.3d at 334; *Cent. Illinois Carpenters Health & Welfare Tr. Fund v. Olsen*, 467 F. App'x 513, 518 (7th Cir. 2012) (once determination is made that two entities are single employer, both entities need to make contributions for "covered employees").

In interpreting a CBA, the usual interpretive rules that govern private contracts are not the be-all and end-all for examining a CBA. Unlike typical private contracts, which are negotiated out of free choice and without any compulsion necessitating the formation of a contractual relationship, CBAs are based on "pre-existing relationships not easily broken and remade." *Bhd. of Maint. of Way Emps. v. Atchison, Topeka & Santa Fe Ry. Co.*, 138 F.3d 635, 640 (7th Cir. 1997). When interpreting a CBA, then, courts "must look beyond the document itself" and "look to the parties' 'practice, usage and custom,'" while being careful not to contradict the

---

Circuit decisions and noting that the Seventh Circuit had previously rejected this argument in the ERISA context). It is only *after* a court decides that two entities are a single employer, then, that it engages in the bargaining-unit analysis. That analysis is not triggered here, however, because the question at issue is simply whether the terms of the CBA entered into by Dynamic apply to FAB employees. *See Moriarty v. Svec*, 164 F.3d 323, 334 (7th Cir. 1998). For that reason, this case does not touch on any area of NLRB expertise and this Court has the authority to decide it. *See id.* at 334-35.

explicit text. *Id.* at 641 (quoting *Transp.-Commc'n Emp. Union v. Union Pac. R. Co.*, 385 U.S. 157, 161 (1966)); *see also United Food & Commer. Workers, Local 1546 v. Illinois-American Water Co.,* 569 F.3d 750, 756 (7th Cir. 2009) ("[CBAs] have implied as well as express terms and the authority of an arbitrator to interpret a [CBA] includes the power to discover such terms.").

The Funds seek contributions for ten employees: (1) Genebacher; (2) Jack Hukalowicz; (3) Rodriguez; (4) Marcin Hukalowicz; (5) Haberkorn; (6) Penrod; (7) Prezzia; (8) Almonaci; (9) Bialyjan; and (10) Cox. For the reasons stated below, no reasonable factfinder could conclude that the CBA applies to nine of the ten employees. On Genebacher though, neither side has shown, as a matter of law, that the CBA either does or does not apply to him, and thus both cross-motions for summary judgment are denied as to him.

### A. Jack and Marcin Hukalowicz

The Defendants argue that FAB cannot be held liable for contributions as to JJH employees Jack and Marcin Hukalowicz, because those two are not even FAB's employees; instead, they are independent contractors. Defs. Br. at 21-23. Under the CBA, Dynamic is obligated to make contributions only for its employees, and not its subcontractors. *See* R. 58.3, CBA, Art. 9.

In evaluating whether someone is an employee versus an independent contractor, courts examine the following factors: (1) right to control; (2) type of business; (3) supervision; (4) skill level; (5) tools and materials; (6) continuing relationship; (7) method of payment; (8) integration with the employer; (9) intent; and

17

(10) employment by more than one firm. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1992) (adopting the common law test for determining who qualifies as an employee under ERISA). No one factor is decisive. *Id.* at 324 (citing *N.L.R.B. v. United Ins. Co. of America*, 390 U.S. 254, 258 (1968)). But one is more important than the others: "the employer's right to control is the most important when determining whether an individual is an employee or an independent contractor." *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378 (7th Cir. 1991); *Jones v. Seko Messenger*, 955 F. Supp. 931, 932-33 (N.D. Ill. 1997).

The Defendants here have presented sufficient evidence to establish, beyond a genuine dispute, that the JJH employees were truly employees of JJH and independent contractors as to FAB. A similar case is *Mazzei v. Rock N Around Trucking, Inc.*, 246 F.3d 956, 964-65 (7th Cir. 2001). There, the Seventh Circuit deemed some truck drivers to be independent contractors because they could refuse to work for the company at any time and for any reason, they could work for other companies at any time, and they could end their relationship with the defendant at any time and for any reason without penalty. *Id.* So too here. The Funds admit that JJH reported income from sources other than FAB in both 2012 and 2016, that the JJH employees were free to come and go as they pleased, and that they had no minimum work requirement. R. 61.16, 2012 JJH Tax Return; R. 61.17, 2016 JJH Tax Return; Hukalowicz Dep. at 40:3-15, 42:2-43:2, 65:12-66:15. *See also* Pls.' Resp. DSOF ¶¶ 59-61. It is also not disputed that JJH employees supplied their own tools and paid their own travel expenses. Hukalowicz Dep. at 98:9-21; Bartuch Aff. ¶ 19. *See also*

Pls.' Resp. DSOF ¶ 63, 66. This evidence puts beyond dispute that Jack and Marcin Hukalowicz were independent contractors and thus not subject to the CBA.

## B. Kevin Genebacher

The Funds seek contributions for FAB foreman Kevin Genebacher. They assert that Genebacher regularly performed work on tractors and was thus a tractor mechanic to whom the CBA unquestionably applied. Pls. Br. at 17. The Defendants argue that they owe no contributions for Genebacher because he is a supervisor, rather than a tractor mechanic, and thus is not covered by the CBA by virtue of the National Labor Relations Act (NLRA). Defs. Reply at 14.

The NLRA excludes certain individuals from the meaning of "employee," including "supervisors." 29 U.S.C. § 152(3). Under the Act, a supervisor is

> any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, *or* discipline other employees, *or* responsibly to direct them, *or* to adjust their grievances, *or* effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11) (emphases added). Notice that "or" is the conjunction used throughout the definition. The Seventh Circuit has long held that this definition is to be read disjunctively. *N.L.R.B. v. Winnebago Television Corp.*, 75 F.3d 1208, 1213 (7th Cir. 1996). So "[a]n employee who possesses any one of the iterated criteria qualifies as a supervisor within the meaning of § 152(11)." *Id.*

Neither the Funds nor the Defendants have met their burden to conclusively demonstrate that Genebacher either was or was not a supervisor. The Funds correctly point out that Genebacher was not responsible for disciplining employees, approving

vacation or sick time, or interviewing employees. Genebacher Dep. at 37:15-40:16. But Siwicki testified that Genebacher gave work instructions to Salazar and Bednarowicz, and Bartuch testified that employees would report problems to either Siwicki or Genebacher. Siwicki Dep. at 40:10-41:14; Bartuch Dep. at 121:24-122:4. This is some evidence of Genebacher's authority to assign work to employees and perhaps to adjust their grievances. But it is not clear how much of that authority was premised on Genebacher's independent judgment, as the definition of supervisor requires. § 152(11) ("if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment"). Based on the uncertain evidence, when viewing the evidence in favor of one side or the other in the competing cross-motions, there remains a genuine issue on whether Genebacher either was or was not a supervisor. The Court must make a factual finding, so both motions are denied as to Genebacher.

## C. FAB trailer and field mechanics

The last group of employees for which the Funds seek contributions are the other FAB mechanics: (1) Rodriguez; (2) Haberkorn; (3) Penrod; (4) Prezzia; (5) Almonaci; (6) Bialyjan; and (7) Cox. The Defendants assert that these mechanics are either "trailer" mechanics or "field" mechanics and are thus not covered by the CBA, which is limited to "Tractor mechanics." Defs. Br. 18-20.

The first article of the CBA is the Recognition clause, which limits the agreement's application to "Tractor mechanics." 2003-2017 CBAs at Art. 2. This term is not expressly defined anywhere in the CBA. *See* 2003-2017 CBAs. Section 7 does

define the position of "mechanic" as any employee "who dismantles or repairs or assembles any part of the car, truck, tractor body, or internal combustion engine," while also expressly excluding "trailer mechanics" from the scope of the agreement. 2003 CBA at 4. But the agreement does not include a definition for "trailer mechanic" either. The CBA is thus ambiguous as to which mechanics it covers.

When presented with an ambiguous agreement, a court may consider evidence outside of the contract itself. *Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 783-784 (7th Cir. 2005). The Defendants here have presented undisputed evidence that the parties intended to limit the scope of the CBA to a certain type of mechanic, specifically, mechanics who worked primarily on the tractor (the front part of the semi-truck holding the engine). The parties intended to exclude a different type of mechanic, namely, mechanics who worked primarily on the trailer (the back part of the semi-truck that is hooked up to the tractor). In 2003, Kofkin, Dynamic's attorney, proposed adding the term "Tractor mechanic" to the Recognition Clause and eliminating the classification for trailer mechanic to reflect the nature of the work being performed by the Dynamic Employees. R. 58.4, Kofkin Dep. at 53:9-55:20; R. 61.8, Kofkin Proposals to Union. The Funds do not contest this. *See* Pls.' Resp. DSOF ¶31.

Instead, the Funds take issue with the way that the Defendants define "tractor" and "Tractor mechanic."[3] But neither side has provided a workable

---

[3]The Funds also make the alternative argument that bargaining-unit work is defined according to the definition of "Mechanic" in Article 2 of the CBA. Pls. Br. at 17. But fund manager Steve Bukovac conceded (appropriately) that he relies on the recognition clause to determine who is covered by a CBA. R. 61.7, Bukovac Dep. at 22:22-23:24.

definition of the term. For their part, the Defendants rely on Kofkin's description of a tractor mechanic: "a guy who can get under the hood and take down the engine." Kofkin Dep. at 57:5-7. That colloquial description cannot possibly help in distinguishing between the two types of mechanics. But the Funds do no better. The Funds rely on former Union employee Stephen Tyeptenar, who defines the position as someone who works on "any of the mechanical parts." R. 61.6, Tyeptenar Dep. at 13:15. That sweeping definition does not help distinguish between tractor versus trailer mechanics.

Without explicit text to rely on, the Court must turn to the parties' past practice and customs. The parties first entered into a CBA in 1994 and have operated under the current version since 2008. 1994-2003 CBAs; 2003-2017 CBAs. Neither party has alleged that either Dynamic or FAB made contributions for any employee outside of Dynamic's two tractor mechanics. Critically, the Funds audited Dynamic in 2009, 2012, 2014 and received a report documenting the results each time. All three reports stated that Dynamic had interests in related operations, and the 2012 and 2014 reports identified FAB by name. 2009 Audit Report; 2012 Audit Report; 2014 Audit Report. Yet none of the reports turned up any exceptions in contributions made by Dynamic or raised any flags at all. 2009 Audit Report, 2012 Audit Report, 2014 Audit Report. Finally, Tyeptenar visited the Dynamic/FAB facilities multiple times a year and testified that, other than Salazar and Bednarowicz, the other mechanics working in the shop were "trailer mechanics" who did not "have the knowledge of the

power [train] or how to repair the power [train]." Tyeptenar Dep. at 21:21-22:9, 23:3-12.[4]

Based on the weight of this evidence, no reasonable factfinder could conclude that the parties intended for the CBA to cover anyone other than skilled mechanics who worked exclusively on the power train part of a semi-truck. None of the seven FAB mechanics fall under this definition. At best, the Funds allege that, before FAB and Dynamic merged and Dynamic ceased to exist, these seven mechanics replaced tires, fixed headlights, changed batteries, fixed windshield wipers, fixed clutch problems, and fixed turn signals. Genebacher Dep. at 48:1-50:9; Salazar Dep. at 83:23-86:15, 94:7-96:11, 145:6-146:8, 152:18-154:14; Haberkorn Dep. at 49:12-50:3, 69:20-72:7; Siwicki Dep. at 67:5-68:21; R. 58.18 Prezzia Dep. at 16:11-17:23; Bednarowicz Dep. at 122:3-124:14, 127:20-128:14; Bartuch Dep. at 94:7-95:8; R. 58.38, Cox Dep. at 17:18-18:9, 18:22-20:7; R. 58.44, Bialyjan Dep. at 26:3-22. None of this concerns the power train of the tractor, nor does the skill involved in the FAB work rise to the level of skill required by a true tractor mechanic. In fact, Genebacher testified that the only mechanics who performed work on the power train were Bednarowicz, Salazar, Jack Hukalowicz (the JJH employee), and himself, while

---

[4]This analysis is distinct from the affirmative defense of waiver. Although Defendants did not expressly rely on this argument in their summary judgment briefing, the Funds accurately note that many of Defendants' facts seemed to be indirectly aimed at putting forth this affirmative defense. R. 67, Pls. Reply at 4-5. The Funds also correctly assert that Defendants waived their waiver argument when they failed to include it in their Answer and Affirmative Defenses. Pls. Reply at 5. *See also* R. 21, Answer to Compl. Nonetheless, much of the evidence that might be used to support a waiver defense is likewise probative of the parties' past practices and customs and supportive of Defendants' argument that only the Dynamic tractor mechanics are covered under the CBA.

Bednarowicz testified that the FAB mechanics were *trailer* mechanics, helpers, or drivers. Genebacher Dep. at 69:12-70:6; Bednarowicz Dep. at 56:17-63:9; *see also* R. 61.1, Bartuch Affidavit ¶ 12. Even viewed in the Funds' favor, the record evidence establishes that (1) Rodriguez; (2) Haberkorn; (3) Penrod; (4) Prezzia; (5) Almonaci; (6) Bialyjan; and (7) Cox are not tractor mechanics.

### IV. Continuing Obligation

There is one final dispute between the parties. The Funds argue that, because Dynamic failed to timely notify the Funds of their intention to terminate the Participation Agreement, Defendants have an ongoing obligation to contribute for all bargaining-unit work until February 28, 2020 (even though, after the May 2017 merger, the CBA no longer applies). Defendants advance several arguments to contest this assertion. For the reasons discussed below, those arguments must be rejected.

First, Defendants rely on a Sixth Circuit decision holding that a benefits Participation Agreement cannot be enforced in the absence of an applicable CBA. Defs. Br. 23-24 (citing *Cent. States, Se. & Sw. Areas Pension Fund v. Gen. Materials, Inc.,* 535 F.3d 506, 509 (6th Cir. 2008)). But Defendants concede that the Seventh Circuit (which of course is binding here) has expressly held that "it is not even necessary that a CBA exist for an employer to incur such obligations [under a participation agreement]." *Auto Mechanics Local 701 Welfare & Pension Funds v. Vanguard Car Rental, USA, Inc.*, 502 F.3d 740, 748 (7th Cir. 2007). Indeed, as "a matter of ERISA law … [a] participation agreement is … one potential source of a

contribution obligation." *Id*. So the termination of the CBA did not automatically terminate the Defendants' obligations under the Participation Agreement.

Second, the Defendants argue that any obligation under the Participation Agreement terminated once Dynamic merged into FAB. Defs. Br. at 24. But that argument is a non-starter because, as discussed earlier, Dynamic and FAB comprised a single employer. Because the two companies were so integrated, they were always in effect a single entity. FAB was always—and remains—liable for contributions for any bargaining-unit work completed by employees covered under the CBA. *See Moriarty*, 164 F.3d at 334 ("Once the court found that [the two entities] were a single employer, ... it could impose liability in accordance with the terms and conditions of [the CBA].") (citation omitted); *Bd. Of Trs. of the Pipe Fitters Ret. Rung, Local 597 v. Am. Weathermakers, Inc.*, 150 F. Supp. 3d 897, 905 (N.D. Ill. 2015) (holding that if two businesses are determined to be a single employer, then both are equally liable under an agreement entered on behalf of only one of them). Because Dynamic would be liable for contributions for covered employees until February 28, 2020 if it still existed, so too is FAB because it was always bound by the terms of the CBA. For this reason, the merger does not by itself extinguish the duty to contribute.

Next, the Defendants contend that they provided proper notice to terminate their obligations to the Funds on May 1, 2017, when Dynamic stopped sending remittance reports, and again on July 12, 2017, when they sent a letter to the Funds. *Id*. at 25. But the Defendants offer no explanation of how either purported notice satisfied their obligation to provide notice *sixty days* before the CBA was terminated.

Participation Agreements ¶ 6. The last CBA terminated on February 28, 2017, so the Defendants missed the deadline to escape (until the CBA expires on February 28, 2020).

Finally, the Defendants believe the Participation Agreement terminated along with the last CBA because Paragraph 3 of the Participation Agreement states that it remains in effect for a period coterminous with the CBA. Defs. Br. at 25. But that paragraph does not say that the Agreement will *automatically* terminate as soon as a CBA does. Indeed, Paragraph 6 expressly accounts for a situation where no new CBA is executed and Dynamic fails to provide notice of termination from the Participation Agreement: the agreement remains in effect for a total of three years. The Seventh Circuit has interpreted a participation agreement with two virtually identical clauses to mean just that. *Auto. Mechs. Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 749-50 (7th Cir. 2007). So even though the CBA terminated, there remains a "status quo" period for benefit contributions under a participation agreement. *Id.*

In light of the failure to provide timely notice, the Defendants remain liable for contributions as to Salazar and Bednarowicz, beginning on April 30, 2017. If Genebacher is found to be a covered employee, then the Defendants will also be liable for ongoing contributions as to him. There might be no just reason to delay entry of judgment on this ongoing-contributions claim, so the Funds may move for entry of partial judgment under Federal Rule of Civil Procedure 54(b). If granted, the Court would order FAB to submit to a payroll-compliance audit to determine the amount of

contributions owed for Salazar and Bednarowicz, and when that is calculated, FAB would have to pay it even as the remaining dispute is litigated.

## V. Conclusion

For the reasons discussed, the Defendants' motion for summary judgment is granted on the alter-ego claim, as well as on excluding FAB trailer and field mechanics and the JJH employees. The Funds' motion is granted insofar as Dynamic and FAB are deemed to be a single employer, and also on the issue of FAB's ongoing obligations to contribute for Salazar and Bednarowicz. The remaining dispute is whether the CBA (and the corresponding benefits obligation) applies to Genebacher. The parties shall commence settlement negotiations immediately. At the next status hearing, the parties shall report on the settlement progress, and also shall be prepared to state their position on whether an in-court evidentiary hearing is needed (essentially, a bench trial on the claim as to Genebacher), or whether they are willing to submit that issue to the Court on the papers for a finding.

ENTERED:


    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 30, 2018